# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 97-3142

_____

Juan Jaurequi,                              *
                                            *
       Plaintiff - Appellant,      *
                                            *
  v.                                       *
                                            * Appeal from the United States
Carter Manufacturing Co., Inc.,             * District Court for the
                                            * Eastern District of Missouri.
       Defendant,                 *
                                            *
John Deere Company; Deere &                 *
Company,                                    *
                                            *
       Defendants - Appellees.    *

_____

Submitted:  February 11, 1998
Filed:   April 6, 1999

_____

Before McMILLIAN and HANSEN, Circuit Judges, and DAVIS,[1] District Judge.

_____

HANSEN, Circuit Judge.


     Juan Jaurequi brought this diversity action against John Deere Company and
Deere & Company (collectively "Deere"), alleging that design and warning defects

---

[1]The Honorable Michael J. Davis, United States District Judge for the District
of Minnesota, sitting by designation.

associated with a Deere corn head proximately caused an accident in which Jaurequi's legs were amputated. Shortly before trial, Deere moved for the exclusion of Jaurequi's proffered expert testimony and for summary judgment. The district court[2] granted both motions, and Jaurequi appeals. We affirm.

## I.

Deere manufactures mobile combines which harvest and process various crops, including corn, beans, and milo. Although the same combine may be used for all of these crops, each crop requires the use of a different "head" to gather the standing crop and convey it into the combine for processing. For example, when harvesting corn, a corn head must be attached to the front of the combine. This case involves a 1974 Model 343 Deere three row corn head. The corn head contains several moving parts which draw the corn stalks in and separate the ears of corn from the stalks as the combine moves down the rows of corn. A cross auger then moves the separated ears to the rear center of the head where the ears are deposited at the throat of the combine and are then taken up into the bowels of the combine where they are husked and shelled. A corn head is intended to be used only for corn, and only while the combine is moving through a field harvesting standing corn.

The corn head at issue in this case was manufactured and sold by Deere in Moline, Illinois, in 1974. In 1986, Carter Manufacturing (Carter) acquired the already used corn head on behalf of Texas Triumph Seed Company (Texas Triumph). Texas Triumph, a specialty seed company, required a unit specially suited for harvesting small test plots of corn. Carter constructed this specialty unit out of a 1961 Massey-Harris combine and the Deere corn head. Both components were significantly modified so that they could work together and so that they could accomplish Texas Triumph's

---

[2]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

needs. This new combination unit was suitable only for research plot use and was named the "Carter Plot Combine." Deere was never informed or consulted regarding the modifications made to its corn head.

When Carter purchased the corn head, all of the original warnings Deere had placed on it had been obliterated with green paint by a previous owner. Rather than replacing the warnings with updated ones available from a Deere dealer, or uncovering the original warnings, Carter again painted over the entire corn head, including the already painted over warnings, with red paint to match the red Massey combine.

The plaintiff, Juan Jaurequi, was an employee of Texas Triumph when the injuries giving rise to this suit occurred. On the day he was injured, Jaurequi, together with other Texas Triumph employees, was using the Carter Plot Combine to harvest milo, also known as sorghum. The Carter Plot Combine had not been constructed with this use in mind, and the unit was in fact incapable of harvesting standing milo. However, it was possible to place hand-picked milo heads directly on the cross auger at a point well behind the corn head's dangerous crop gathering parts where it would then be transported to the throat of the combine. This is what Jaurequi and his coworkers were doing on the date of the accident. The workers hand-picked the standing milo and brought this milo in bags to the stationary but operating combine. The workers, standing to the side and near the rear of the corn head, then dumped the bags of milo onto the cross auger at the rear of the corn head at a point behind the corn head's uselessly churning snapping rolls and gathering chains and hooks. This process was necessary because Texas Triumph had neglected to bring its milo harvester to the Missouri test plots.

On the day before the accident, when the machine had been used to harvest corn, Jaurequi was warned by a coworker, Jerry Anquiano, that he should never go in front of the corn head, because the machine's dangerous moving parts would pull him into the corn head. Additionally, on the day of the accident, Jaurequi was twice warned by

Ronald Terrell, another coworker, that he should not feed the corn head from the front because he risked being pulled in by the moving parts. Terrell instructed Jaurequi to stand to the side of the corn head when feeding the machine. However, Jaurequi persisted in feeding the machine from the front. On one occasion, Jaurequi moved too close to the corn head's moving parts which gather the stalks and snap off the ears. His legs became enmeshed in the machinery, and he sustained severe injuries to both legs which have left him a double amputee. After the accident, Jaurequi admitted to at least four people and on at least eight occasions that the accident was entirely his fault and that he had been warned of the dangers. (See Jt. App. at 740-42, 748-50, 847, 850-52, 945-49, 981-82, 1066, 1093-96).

Jaurequi later brought this products liability action against Deere, alleging that Deere was both strictly liable and liable in negligence for failures to warn and for design defects associated with the corn head. Central to Jaurequi's case was the proffered "expert" testimony of Terrence Willis and Harold Wakely.

Terrence Willis, a mechanical engineer, was prepared to testify that Jaurequi "was not provided the necessary detail which would identify where the hazard zone ended and the safety region began," and that "[s]uch specific information cannot be determined visually . . . because of the speed at which the gathering chains suddenly emerge from under the snout . . . ." (Jt. App. at 188). It was Willis's opinion that although "the motion of the gathering chains in the immediate vicinity of the snapping rolls is open and obvious," the risk is not obvious at the point at which the gathering chains emerge, which is closer to the tips of the snouts. (Id. at 189). At the point of emergence, Willis stated that the gathering hooks are invisible because they are moving so fast. Willis admitted, however, that he had never observed the corn head at issue while it was running (id. at 344) and that he had never seen *any* corn head in operation except from the roadside during his various trips through the Illinois countryside. (Id. at 337). When asked for the basis of his opinion that the gathering hooks are invisible

-4-

when they emerge from under the snout, Willis stated, "I guess as an engineer, I know what it looks like in the running mode." (Id. at 344).

Willis believed that the corn head should have been equipped with "larger and more prominent warnings." (Id. at 188). In particular, Willis proposed "a plastic covered snout area colored with black and yellow stripes." (Id. at 189). Willis speculated in his affidavit that, had the warnings been designed as he suggests, they would not have been painted over. (Id. at 189). However, he admitted in his deposition that he had no basis for this belief. (Id. at 351).

In his affidavit, Willis stated that Jaurequi was not warned of the "specifics of this hazard zone." (Id. at 188). In his deposition, however, Willis admitted that he had not evaluated Jaurequi's behavior and had focused his analysis only on the question of whether the mechanical design of the corn head was defective. (Id. at 338). He admitted that he did not actually know what Jaurequi knew or did not know. (Id. at 343).

Willis further opined that Deere should have incorporated "awareness barriers" into its corn head. (Id. at 190-91, 351-55). Specifically, Willis opined that awareness barriers would foster safety and would not interfere with the operation of the machine. (Id. at 352-53). Willis admitted, however, that he had not studied the feasibility of this idea, much less designed and tested it. (Id. at 354). He additionally admitted that he was unaware of any studies indicating the effectiveness of awareness barriers, (id. at 354), and that he had never before designed an awareness barrier of any kind. (Id. at 359). Finally, Willis admitted that he was aware of no manufacturer of corn heads which had ever put awareness barriers in front of the gathering chains as he proposed should be done. (Id. at 354).

Jaurequi also proffered the expert testimony of Harold Wakely, a human factors engineer who holds a doctorate in experimental psychology. Wakely was prepared to

testify that the corn head was defective because the original warning signs were too small, too far from the point of danger, and oriented at an angle which made them difficult to read. Additionally, Wakely was prepared to testify that the warning did not emphasize the precise point at which the danger was concentrated. Wakely admitted, however, that he had never read the original warnings on the corn head and did not know what these warnings actually said. (Id. at 302-03).

Wakely felt that alternative warnings were necessary because the gathering hook on the gathering chain "is not visible at the time of danger but only after the greatest hazard is passed as it moves away from the subject." (Id. at 178). Wakely stated in his affidavit that although Jaurequi had been warned by his coworkers of general dangers associated with the combine, Jaurequi was not aware of "the exact location of the danger," i.e., the gathering hooks at the point of emergence under the snouts. (Id.). This statement contradicts Wakely's deposition testimony that "I don't know what kind of warning was given to Mr. Jaurequi." (Id. at 304).

Wakely admitted that he has found no product of any vintage which employed the types of warnings, stripes, and chevrons that he was advocating. (Id. at 305). Wakely speculated in his deposition that John Deere could have made the snouts out of plastic and that this might have made it difficult to paint over any chevrons. (Id. at 304A). When pressed, however, Wakely admitted that he had no basis for saying "how long or if paint would stay on the plastic." (Id. at 307).

Wakely stated for the first time in his affidavit that "the high contrast chevrons and warnings placed on the snout as used by Hege and New Idea since 1964 and 1957 respectively would have provided a far more effective warning." (Id. at 178). In his deposition, Wakely had admitted that he had no knowledge of chevrons being used on corn heads at or before the time that the corn head at issue in this case was manufactured. (Id. at 308).

Shortly before trial, Deere moved to exclude the testimony of Willis and Wakely, and for summary judgment on all claims. The district court granted both motions, and this appeal followed.

## II.

A.    Exclusion of Expert Testimony

Jaurequi contests the district court's decision to exclude the testimony of Willis and Wakely. We review the district court's exclusion of expert testimony for abuse of discretion. General Elec. Co. v. Joiner, 118 S. Ct. 512, 517, 519 (1997); Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 296 (8th Cir. 1996) ("Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion."), cert. denied, 117 S. Ct. 1552 (1997).

In excluding the testimony of Willis and Wakely, the district court relied on Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993). Jaurequi contends that such reliance was improper, arguing that the proffered testimony of Willis and Wakely was not scientific but rather technical and does not fall within the scope of Daubert.

### *Daubert*

In Daubert, the Supreme Court determined that the Frye test, which required the exclusion of all scientific testimony not derived from generally accepted principles or theories, see Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), had been superseded by Rule 702 of the Federal Rules of Evidence. See Daubert, 509 U.S. at 586, 588-89. Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In Daubert, the Court determined that, under Rule 702, "general acceptance" is no longer an absolute prerequisite to admissibility. 509 U.S. at 588-89. However, the Court emphasized that trial courts must still screen proffered expert testimony for relevance and reliability. Id. at 589.

The Court's Daubert opinion is primarily addressed to the issue of how a trial court should assess the reliability of scientific testimony. The Court instructed that "[i]n a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*." Id. at 591 n.9. The Court suggested that, in its attempt to determine whether proffered scientific evidence is scientifically valid, a trial court should ordinarily consider, among other factors, the following: (1) whether the underlying theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a known or knowable rate of error; (4) whether the theory or technique is generally accepted in the relevant community. Id. at 593-94. This list of factors is not exclusive, and the trial court is left with great flexibility in adapting its analysis to fit the facts of each case. Id. at 593, 594. The polestar, however, must always be "scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." Id. at 594-95.[3]

---

[3]While Daubert states that a trial court's focus must be on the experts' underlying principles and methodology rather than on his conclusions, the Supreme Court has since clarified that "conclusions and methodology are not entirely distinct from one another," and that "[t]rained experts commonly extrapolate from existing data." Joiner, 118 S. Ct. at 519. Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id.

Jaurequi argues that the district court erred in viewing the proffered testimony of Willis and Wakely through the lens of <u>Daubert</u>. Jaurequi argues that the reliability factors expounded in <u>Daubert</u> should only be applied in cases involving novel scientific evidence, and that Willis's and Wakely's testimony is not scientific but rather technical.

The Supreme Court did not explain in <u>Daubert</u> how its discussion of scientific expert testimony would impact on these other types of expert testimony. Most recently, however, the Court has squarely held that <u>Daubert</u> applies to all expert testimony. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, No. 97-1709, 1999 WL 152455, at *4 (U.S. Mar. 23, 1999) ("We conclude that <u>Daubert's</u> general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.") In <u>Kumho</u>, the expert whose testimony was excluded was a tire failure analyst who held a master's degree in mechanical engineering and ten years of experience at Michelin, who had testified as a tire failure consultant in other tort cases, and who had personally examined and inspected the blown out tire at issue. The Court reaffirmed that we are to test the district court's evidentiary ruling excluding expert testimony under an abuse of discretion standard recognizing "that the law grants the trial judge broad latitude to determine" whether the <u>Daubert</u> factors "are, or are not, reasonable measures of reliability in a particular case." <u>Id.</u> at *11.

*Cases Applying <u>Daubert</u>*

While this court has never attempted to map the exact boundaries within which a <u>Daubert</u>-type analysis is appropriate, several of our post-<u>Daubert,</u> pre-<u>Kumho</u> cases have applied the <u>Daubert</u> reliability factors to proffered expert testimony very similar to that of Willis and Wakely in this case. See <u>Dancy v. Hyster Co.</u>, 127 F.3d 649, 652 (8th Cir. 1997) (district court properly looked to <u>Daubert</u> reliability factors for guidance regarding the admissibility of proffered expert testimony in alternative design case),

-9-

cert. denied, 118 S. Ct. 1186 (1998); Peitzmeier, 97 F.3d at 296-97 (same); Pestel v. Vermeer Mfg. Co., 64 F.3d 382, 384 (8th Cir. 1995) (same).

Our decision in Peitzmeier is particularly instructive. There the plaintiff objected to the district court's invocation of Daubert, arguing that Daubert is inapplicable to "opinions founded on basic engineering principles." Peitzmeier, 97 F.3d at 297. We disagreed, writing that the Supreme Court's discussion in Daubert is relevant not only to "novel scientific testimony," but also to engineering testimony regarding alternative designs in products liability cases. Id. Because the expert's proposed safety mechanisms had been neither designed nor tested, because his ideas had not been subjected to peer review, and because the expert presented no evidence regarding his theory's rate of error or its general acceptance, we upheld the trial court's exclusion of the proffered expert testimony. Id. at 297-98.

In Pestel, another alternative design case, we similarly upheld the district court's exclusion of proffered engineering testimony, again citing relevant Daubert factors. We pointed out that the proposed safety device had not been tested or even developed. Pestel, 64 F.3d at 384. With regard to peer review, we noted that the expert had not consulted others in the industry or subjected the concept to any manufacturers, engineers, or professors for scrutiny. Id. We also noted that the plaintiff had presented no evidence regarding general acceptance. Id. We expressly declined to consider the fourth Daubert factor—potential rate of error—because this factor did not appear to be relevant to our inquiry. Id.

In Robertson v. Norton Co., 148 F.3d 905, 907-08 (8th Cir. 1998), we held that a district court abused its Daubert discretion in admitting expert opinion concerning the adequacy of product warnings which accompanied a heavy duty sander/grinder because, among other reasons, the expert had not even reviewed the warnings accompanying the grinder. Similarly, in this case the witness Wakely did not know what the original Deere warnings said, and in fact testified that he did not care what they had said. (Jt. App. at 302).

-10-

As these cases illustrate, it is clearly established in this circuit that when engineers are brought in to suggest that a product should have been designed differently, the district court does not err in looking to Daubert for guidance as to whether such testimony should be admitted or excluded.  Of course, the Daubert reliability factors should only be relied upon to the extent that they are relevant, see Pestel, 64 F.3d at 384, and the district court must customize its inquiry to fit the facts of each particular case, see Daubert, 509 U.S. at 594 ("the inquiry envisioned by Rule 702 is, we emphasize, a flexible one.") (footnote omitted).  In short, although

> [n]ot every guidepost outlined in Daubert will necessarily apply to expert testimony based on engineering principles and practical experience, . . . the district court's "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue" is no less important.

Watkins, 121 F.3d at 990-91 (quoting Daubert, 509 U.S. at 592-93); accord Cummins, 93 F.3d at 367 n.2.

Our Daubert approach to expert testimony is fully in accord with the Supreme Court's decision in Kumho.  Reaffirming Daubert's description of Federal Rule of Evidence 702's inquiry as "'a flexible one'" and "'tied to the facts' of a particular 'case'," the Court held in Kumho that it could "neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence." Id. at *9 (quoting Daubert, 509 U.S. at 591, 594).   The specific factors identified in Daubert must be considered by the trial judge when they reasonably measure the reliability of the expert's testimony. Id. at *10.

*Application to Proffered Expert Testimony*

In the case at hand, Willis was prepared to testify that the corn head was unreasonably dangerous because it lacked awareness barriers. However, Willis has not attempted to construct or even draw the suggested device, much less test its utility as a safety device or its compatibility with the corn head's proper function. Nor has he pointed to any manufacturer that incorporates awareness barriers into corn heads or similar farming machinery. In short, he has provided no basis for us to believe that his opinions are anything more than unabashed speculation. We therefore hold that the district court did not abuse its broad discretion in concluding that the proffered testimony regarding the lack of awareness barriers flunked the reliability prong of Daubert.

The remainder of the expert testimony proffered by Jaurequi dealt with the sufficiency of the warnings on the corn head. As summarized above, Willis and Wakely felt that the warnings were deficient in placement, design, orientation, and content. However, this testimony also appears unreliable. Neither Willis nor Wakely had created or even designed a warning device which would have been more appropriate, much less tested its effectiveness. In fact, as indicated above, Wakely admitted that he had never even read the warnings which Deere did employ (and which had been painted over before Carter acquired the corn head) and that he was unaware of their content. Finally, neither Willis nor Wakely pointed in their deposition testimony to other manufacturers of farm machinery who were employing chevrons or pictorial warnings in 1974. The reliability of their testimony is therefore extremely questionable.

The district court's studied consideration of the plaintiff's proffered expert testimony was exhaustive and thorough. It distinctly recognized that Daubert's factors are not exclusive and "that many factors may bear on a court's Rule 702 inquiry." (Jt. App. at 151). Our close review of the district court's consideration of the expert

testimony convinces us that it analyzed the proffered testimony in exactly the same way the Supreme Court said the inquiry may be done under <u>Daubert</u> and Rule 702 (see <u>Kumho</u>, 1999 WL 152455, at *14) and that its decision to exclude the testimony of both experts was not only well within its broad discretion as to such matters, but also correct.

That said, the more serious problem with the proffered expert testimony on the failure-to-warn issue is one of relevance. It is undisputed that the corn head's warnings had twice been painted over by persons other than Deere. Neither expert had any basis for concluding that the warnings they proposed would have escaped either painter's brush. Thus, the alleged inadequacies of the content of these warnings cannot be considered a cause in fact of Jaurequi's injuries. <u>See</u> <u>Peitzmeier</u>, 97 F.3d at 300 (even if warnings were inadequate, liability will not lie unless "such inadequacy was the proximate cause of [plaintiff's] injuries"). Deere cannot be held responsible for the deliberate obliteration by others of Deere's warnings years after the product was sold.

Furthermore, Jaurequi admitted to four different people on eight separate occasions that he had persisted in loading milo from the front of the corn head even after he had been warned of how dangerous this behavior was. Two coworkers had instructed Jaurequi not to load milo from the front because doing so brought him into close proximity with the dangerous moving parts of the corn head. The last of these warnings came shortly before Jaurequi walked into the moving parts of the corn head and lost his legs. We have held that where, "'despite deficient warnings by the manufacturer, a user is fully aware of the danger which a warning would alert him or her of, then the lack of warning is not the proximate cause of the injury.'" <u>Peitzmeier</u>, 97 F.3d at 300 (quoting <u>Strong v. E. I. DuPont de Nemours Co.</u>, 667 F.2d 682, 688 (8th Cir. 1981)). Such was clearly the case with Jaurequi.

These breaks in the causal chain render any insufficiencies in the painted-over Deere warning signs irrelevant. We therefore find no abuse of discretion in the district court's exclusion of the proffered expert testimony on the failure to warn issue.

B.    Summary Judgment

Jaurequi additionally contests the district court's grant of Deere's motion for summary judgment.  "We review a grant of summary judgment de novo, applying the same standard as that applied by the district court," and we affirm "if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law."  State Farm Mut. Auto. Ins. Co. v. Shahan, 141 F.3d 819, 821(8th Cir. 1998).

In resistance to Deere's summary judgment motion and its highly detailed and annotated statement of uncontested material facts, Jaurequi did not provide countervailing citations to depositions or even a statement of contested facts.  In particular, Jaurequi did not cite to any of his deposition testimony to refute any of Deere's factual assertions concerning Jaurequi's damaging admissions, or to dispute that he had been specifically warned by other employees about the dangers of standing in front of the corn head.  Rather, Jaurequi relied solely on the affidavits of Willis and Wakely.  Because the district court properly excluded the proffered testimony of Willis and Wakely, Jaurequi was left with no defense to summary judgment save a naked pleading.  This is insufficient.  We have said that a district court is not "obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim"  White v. McDonnell Douglas Corp., 904 F.2d 456, 458 (8th Cir. 1990).

Jaurequi's opening brief in this court claims that the district court was "ill-served by Deere's distortions of the record," and that "Deere grossly misstated the evidence

and consequently every single finding of the district court used to support its decision was contrary to the record." (Appellant's Br. at 1, 16.) Jaurequi then sets forth more than ten pages of alleged "true facts." (Id. at 8, et seq.) The effort comes too late. It should have been done in response to Deere's motion before the district court. "Once [Deere] met its burden of demonstrating a lack of genuine issues of material fact, [Jaurequi] was required to designate specific facts creating a triable controversy." Barge v. Anheuser-Busch, Inc., 98 F.3d 256, 260 (8th Cir. 1996). "[A] party opposing a motion for summary judgment may not rest upon the mere allegations or denials of the pleadings, but by affidavits or as otherwise provided in Rule 56 must set forth specific facts showing that there is a genuine issue for trial." Dancy, 127 F.3d 653 (internal quotation marks and alterations omitted); see also Celotex v. Catrett, 477 U.S. 317, 323-26 (1986) (party resisting summary judgment may not resist a properly made motion by referencing its pleadings). The district court was therefore correct in granting Deere's motion for summary judgment.

## III.

Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-15-