**Linda HAUSCHILD, Plaintiff,**

**v.**

**Chris NIELSEN and Alfonza Whitaker, individually and in their official capacity, Defendants.**

**No. 4:03CV3295.**

United States District Court, D. Nebraska.

July 21, 2004.

Elaine A. Waggoner, Waggoner Law Firm, Lincoln, NE, for Plaintiff.

Robert F. Rossiter, Jr., Fraser, Stryker Law Firm, Omaha, NE, for Defense.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

Plaintiff brings a 42 U.S.C. § 1983 suit alleging that her termination from employment with Nebraska State Employees Credit Union (the "Credit Union") violated her due process and equal protection rights and that post-termination actions violated her equal protection rights. A supplemental claim brought pursuant to Neb.Rev.Stat. § 20–148 asserts due process and equal protection violations of the Nebraska Constitution. The defendants are Chris Nielsen (the President of the Credit Union at the time of Hauschild's termination) and Alfonza Whitaker (a member of the Board of Directors of the Credit Union who served as the presiding officer at an investigatory hearing which preceded the termination).[1]

This action is before me on Defendants' motion for summary judgment. Because Defendants were not acting under color of state law and because Plaintiff suffered no deprivation of her due process or equal protection rights, I will grant the motion.

---

1. The original complaint included three additional defendants: the Credit Union, Albert Nielsen, and Linda Knox. The amended complaint removed Albert Nielsen and Knox as defendants. (Filing 15.) Upon stipulation of the parties, the Credit Union was dismissed as a defendant and a supplemental Nebraska common law claim for breach of contract was dismissed. (Filing 50.)

## I. BACKGROUND

The undisputed material facts are as follows. Nebraska State Employees Credit Union is a credit union organized and existing under the laws of the State of Nebraska. (Filing 30, Ex. 1 at 16:3–4; Ex. 2 at ¶ 5.)[2] Membership in the Credit Union has always been limited to

employees of the State of Nebraska, all public employees (Federal, County, City, State) including military personnel (Army Reserve & National Guard) stationed in Dodge County, Nebraska, employees of Community Colleges funded in part by state funds, employees of this credit union, any person whose regular place of employment is in an office maintained by the State of Nebraska, members of their families or any organization of such persons.

(Ex. 1 at 31:23–33:4; Ex. 4 (Credit Union Bylaws) at Art. II, Sec. 1.) Members of the board of directors of the Credit Union must be members of the Credit Union. (Ex. 4 at Art. IV, Sec. 1.) The Credit Union is not a division, agency or political subdivision of the State of Nebraska. (Ex. 2 at ¶ 9.)

Chris Nielsen is currently (and was at the time of Plaintiff's termination) the President of the Credit Union. He has held that position since January 12, 1998. (Ex. 1 at 16:19–22; Ex. 2 at ¶ 3.) Nielsen is not, nor has he ever been, an employee of the State of Nebraska. (Ex. 1 at 38:1–10; Ex. 2 at ¶ 8.)

Nielsen's predecessor as President of the Credit Union, Richard Norris, retired from the Credit Union in late 1997 or early 1998. (Ex. 1 at 27:25–28:3; Ex. 2 at ¶ 4.) Norris was much more lax about the enforcement of Credit Union policies and procedures than was his successor, Chris Nielsen. (Ex. 1 at 55:23–56:13.)

Alfonza Whitaker is, and was at all times relevant hereto, a member of the Board of Directors of the Credit Union and served as the presiding officer in the investigatory meeting which is at issue here. (Ex. 1 at 16:19–22; Ex. 3 at ¶¶ 5–8.) Whitaker is an African American male and is an employee of the State of Nebraska: he serves in a full-time capacity as Executive Director of the Nebraska Equal Opportunity Commission. (Ex. 1 at 38:11–23; Ex. 3 at ¶ 3.)

Linda Hauschild is a white female. (Ex. 1 at 16:3–4.) She began working for the Credit Union in 1972 and was hired by Norris. (Ex. 1 at 27:16–28:3; Ex. 6.) Shortly after she was hired, she became a Loan Officer. (Ex. 1 at 28:22–29:5.) At the time she was terminated, Hauschild was a Vice President of the Credit Union in charge of the operational aspects of the Credit Union. She supervised the day-to-day operations of the Credit Union. (Ex. 1 at 29.)

The Credit Union was subject to periodic audit by the Nebraska Department of Banking and Finance. (Ex. 1 at 55:23–56:13; Ex. 2 at ¶ 14.) After an audit performed by the Nebraska Department of Banking and Finance pointed to some irregularities in loans handled by Plaintiff, she was placed on suspension pending investigation. (Ex. 1 at 70:10–24; Ex. 2 at ¶ 17; Ex. 9.)

At its June 15, 1999 meeting, the Board of Directors of the Credit Union directed a special committee consisting of Albert Nielsen (no relation to Chris Nielsen), Linda Knox, Chris Nielsen and Alfonza Whitaker to investigate the possibility that staff members had violated loan policies with

---

**2.** Most citations to the record are to Filing 30, Defs.' Index of Evidence. Subsequent citations to exhibits contained in Filing 30 are cited without reference to the filing number, e.g. "Ex. __." Citations to evidence contained in Pl.'s Index of Evidence are in this format: "Filing 41, Ex. 1."

regard to loans to two individuals. Whitaker chaired the Special Committee, due to his legal background. (Ex. 9.) Plaintiff was sent a "Pre–Disciplinary Letter" dated June 25, 1999 which gave notice of the allegations against her, cited specific instances of alleged loan policy violations, and stated that the allegations would be considered at an investigatory meeting to be held on June 30, 1999.[3] (Ex. 1 at 72:21–74:16; Ex. 7.) The letter indicated that "[d]uring this meeting you will have the opportunity to respond to these violations and offer any mitigating factors" and ended with the statement that after the investigation, the committee would decide appropriate disciplinary action "up to and including termination of employment." (Ex. 7.) The letter indicated that the Credit Union had incurred losses totaling $73,619.76 when it charged off the loans in question. (Ex. 7.)

The alleged loan policy violations concerned loans to two Credit Union members who happened to be African–Americans. (Ex. 7; filing 47) (Ds.' Reply Br. at 2 ("it is admitted that both of the subject loans were made to African–Americans").)[4] They occurred when Richard Norris was President of the Credit Union. Norris retired from the Credit Union prior to the allegations of loan policy violations. (Ex. 1 at 27:21–28:3.)

Plaintiff obtained legal counsel, Bernie Glaser, to represent her in the termination proceedings. (Ex. 1 at 76:14–77:20; Ex. 6.) Plaintiff first met with Glaser and Richard Norris at the suggestion of Norris. Norris had suggested to Plaintiff that given the allegations that both he and Plaintiff had violated Credit Union policies, they

should both seek legal counsel. (Ex. 1 at 27:21–28:3.) The hearing was initially scheduled for June 30, 1999, but was rescheduled to July 14, 1999 because Plaintiff's counsel was unavailable on the initial date. (Ex. 10.)

Plaintiff's counsel presented a written response to the Pre–Disciplinary Letter on July 14, 1999 when the investigatory hearing commenced. (Ex. 8.) After two hours, time for the day was expiring and Plaintiff sought and obtained additional time for the hearing. (Ex. 1 at 85:22–86:5.) The hearing was reconvened on August 5, 1999, when it consumed an additional three hours. (Ex. 1 at 85:16–86:14.)

At the hearing, Plaintiff was given the opportunity to explain herself with regard to each of the loan irregularities. Her counsel was allowed to cross-examine her. (Ex. 1 at 86:12–87:14.) She was allowed to call former Credit Union president Richard Norris to testify on her behalf. (Ex. 1 at 87:6–14; Ex. 3 at ¶ 10.) Her counsel requested permission to call Chris Nielsen to testify. This request was denied because Nielsen was not employed by the Credit Union at the time the irregularities occurred. (Ex. 1 at 90:4–91:2; Ex. 3 at ¶ 11; Ex. 10.)

Following the hearing, the Special Committee made a written recommendation. The Special Committee made specific written findings regarding the allegations against Plaintiff. It found that, among other things, Plaintiff had acted improperly with regard to the subject loans in that she "routinely ignored, modified and simply disregarded the policies established by

---

**3.** The letter listed specific loans. Pursuant to a confidentiality agreement, the names of the borrowers at issue have been deleted from the record. There were multiple questioned loans to one individual, and one questioned loan to another individual. (Ex. 1 at 73:17–23.)

**4.** Plaintiff also asserts that these two borrowers were Democrats, but offers no evidence to support this assertion. As it is unsupported, I give no weight to this assertion.

the Board of Directors." (Ex. 10; Ex. 3 at ¶ 12.) The Special Committee recommended three options to the Credit Union board: termination, forty-five day suspension followed by demotion and six months probation, or reinstatement with back pay. (Ex. 2 at ¶ 27; Ex. 3 at ¶ 12; Ex. 10.) Plaintiff reviewed the recommendation and agreed that it "accurately set forth what the allegations were, what [her attorney's] written response was, and what the oral testimony was at the time of the hearing." (Ex. 1 at 92:12–93:4.)

The Board of Directors received the Special Committee's findings and recommendations at its August 17, 1999 meeting. The board voted to terminate Plaintiff's employment. (Ex. 11.)

After Plaintiff's termination, the Federal Bureau of Investigation ("FBI") contacted Defendant Nielsen to discuss loan transactions between the Credit Union and one of its members. Defendant Nielsen did not direct or ask the FBI to speak to Plaintiff, and to the best of his knowledge no other Credit Union employee directed or asked the FBI to contact Plaintiff. (Ex. 2 at ¶ 36.) Plaintiff was twice questioned by the FBI concerning Credit Union loans that were made when she was vice president. (Ex. 1 at 103:16–104:22.)

Following Plaintiff's termination, several loans and revolving credit accounts which Plaintiff held with the Credit Union were in arrears, including a second mortgage on Plaintiff's home and a home equity line of credit. (Ex. 2 at ¶ 36; Ex. 14.) The accounts were forwarded to Credit Union attorney James Haszard for normal collection procedure. (Ex. 2 at ¶ 36, Ex. 14.) The Credit Union handled Plaintiff's delinquent accounts no differently than those of other Credit Union members whose accounts were in arrears. (Ex. 2 at ¶ 36.) As part of the collection procedure for delinquent accounts, Plaintiff was sent a mortgage foreclosure notice regarding her second mortgage and home equity line of credit. By the time she received the notice, she had brought the mortgage payments current, though she had been delinquent as recently as two to three weeks before receipt of the foreclosure notice. (Ex. 1 at 108:2–9, 105:3–108:9.) However, the real estate taxes were then delinquent and remained delinquent for some time after the notice was sent. (Ex. 14 at bates no. FS00351.) Plaintiff admits she was in arrears on multiple accounts. (Ex. 1 at 105:3–108:9.) Plaintiff exchanged correspondence with Haszard and subsequently brought her loans and accounts with the Credit Union current. No further action was taken by the Credit Union regarding Plaintiff's loans and accounts other than filing of a cancellation of the notice of default on the second mortgage and home equity line of credit. (Ex. 2 at ¶ 37; Ex. 14.)

At no time during the deliberations of the Special Committee regarding alleged policy violations by Plaintiff or in the subsequent discussions of the Board of Directors was the race or political affiliation of the persons whose Credit Union loans were at issue in the investigation ever discussed. (Ex. 3 at ¶ 15.) Neither Chris Nielsen nor Alfonza Whitaker ever made any comments relating to the race or political affiliation of any member of the Credit Union. (Ex. 1 at 39:6–22, 45:21–25; Ex. 2 at ¶ 15; Ex. 3 at ¶ 15.) No board member of the Credit Union ever made any negative comment regarding the race or political affiliation of any member of the Credit Union within the presence of Nielsen or Whitaker. (Ex. 1 at 44:4–45:20; Ex. 2 at ¶ 16; Ex. 3 at ¶ 15.)

Plaintiff received and was aware of the Credit Union's policy manual. (Ex. 1 at 46:1–48:25; Ex. 5.) That policy manual expressly provides as follows:

Nebraska State Employees Credit Union is an employer at will. Neither these policies nor procedures nor practices based on these policies create an express or implied contract of employment between the Credit Union and its employees concerning the length of job tenure, wages, hours, terms or conditions of employment. Either the Credit Union or any employee may terminate the employment relationship at any time for any reason with or without notice. (Ex. 1 at 49:12–50:11; Ex. 5 at p. 1.) Plaintiff acknowledges that she was an at-will employee of the Credit Union. (Ex. 1 at 46:5–50:11; Ex. 5 at p. 1.)

The Credit Union Policy Manual generally provides for progressive discipline in certain performance-related situations, but specifically provides that discharge from employment is available without the necessity of progressive discipline if there is a violation of Credit Union bylaws, board policies, or designated procedures that may result in a financial loss to the Credit Union. Section 18 of the Policy Manual provides as follows:

> An employee will be temporarily suspended without pay if there are reasonable grounds to believe that any of the following acts have been committed. Conclusive proof shall result in immediate discharge effective from the time of suspension. If charges are not proven, the employee will be reinstated with full back pay.
>
> . . .
>
> (4) Violation of [C]redit [U]nion bylaws, board policies or designated procedures that may result in a financial loss to the credit union.

(Ex. 1 at 52:1–20; Ex. 5 at pp. 17–18.)

## II. DISCUSSION

These are Plaintiff's claims. First, she alleges that Defendants violated her procedural due process rights with respect to her termination from employment by depriving her of a meaningful hearing, failing to give adequate notice of the charges against her, and by depriving her of the opportunity to confront witnesses and present evidence. Second, she alleges that Defendants denied her equal protection by treating her differently than "similarly situated employees who had not participated in the processing of loans of African-Americans who were officials in a Democratic Administration" by terminating her employment and harassing her after termination. The alleged harassment consists of (1) filing a notice of default on a second mortgage loan and a home equity line of credit and (2) contact with law enforcement personnel. Plaintiff alleges that Defendants acted under color of state law. Finally, she asserts that if the court determines that Defendants were not acting under color of state law, Neb.Rev.Stat. § 20–148 provides a cause of action for the alleged due process and equal protection violations.

By its terms, Federal Rule of Civil Procedure 56 provides that a defendant is entitled to summary judgment if the defendant can "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, after adequate time for discovery, summary judgment must be granted when the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and with respect to which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.,* 127 F.3d 649, 652 (8th Cir. 1997), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 316 (1998). *See also*

*Reierson v. Resolution Trust Corp.,* 16 F.3d 889, 891 (8th Cir.1994).

If the moving party meets its burden of demonstrating that there is no issue of material fact, "[t]he plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of 'specific facts creating a triable controversy.'" *Howard v. Columbia Pub. Sch. Dist.,* 363 F.3d 797, 800 (8th Cir.2004) (quoting *Jaurequi v. Carter Mfg. Co.,* 173 F.3d 1076, 1085 (8th Cir.1999).) Although the court views the facts in the light most favorable to the non-moving party, "[it] do[es] not accept unreasonable inferences or sheer speculations as fact." *Id.* (citations omitted).

I turn now to consideration of whether Plaintiff has established that Defendants acted under color of state law, a predicate to § 1983 liability. I then consider the substance of Plaintiff's due process and equal protection claims and her Neb.Rev. Stat. § 20–148 claim.

### Under Color of State Law

■ To state a claim for relief under 42 U.S.C. § 1983, Plaintiff must establish that she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). "[T]he under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Id.* at 50, 119 S.Ct. 977 (internal citations omitted.) Accordingly, the "ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (quoting *Lugar v.*

*Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)).

■ The acts of a private party are "fairly attributable to the State" and are considered to be under "color of state law" for § 1983 purposes "if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). In *Brentwood,* the Supreme Court found that pervasive entwinement of public institutions and public officials in the composition and actions of a high school interscholastic athletic association meant that regulatory actions by the nominally private association were taken under color of state law. *Id.* at 298, 121 S.Ct. 924. The pervasive entwinement stemmed from these facts: 84% of the members of the association were "public schools represented by their officials acting in an official capacity to provide an integral element of secondary public schooling; most of the association's funding was provided, indirectly, by public schools giving up sources of their own income to the association; association employees were eligible for membership in the state retirement system; and half of the association's meetings were held during official public school hours." *Id.* at 299–300, 121 S.Ct. 924. These facts were sufficient to find state action, even though they would not have supported a finding of state action under the public function test or the coercion/encouragement test. *Id.* at 302–03, 121 S.Ct. 924.

*Brentwood* expanded the circumstances under which nominally private action should be treated as state action. The

Court noted that "[w]hat is fairly attributable [to the state] is a matter of normative judgment, and the criteria lack rigid simplicity.... [N]o one fact can function as necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient...." *Id.* at 295, 121 S.Ct. 924. Prior to *Brentwood,* the Court had found that a challenged action constitutes state action when it "results from the State's exercise of 'coercive power,' ... when the State provides 'significant encouragement, either overt or covert,' ... or when a private actor operates as a 'wilful participant in joint activity with the State or its agents'...." *Id.* at 296, 121 S.Ct. 924 (citations omitted). It had also "treated a nominally private entity as a state actor when it is controlled by an 'agency of the State,' ... when it has been delegated a public function by the State, ... when it is 'entwined with governmental policies,' ... or when government is 'entwined in [its] management or control' ...." *Id.* at 296, 121 S.Ct. 924 (citations omitted).

■ Plaintiff asserts that the facts indicate entwinement. (Filing 40, Pl.'s Br. in Opp'n to Summ. J. at 7.) They do not. In addition, Plaintiff ignores the requirement that the entwinement or symbiotic relationship establishing state action must involve "the specific conduct of which the plaintiff complains." *Sullivan,* 526 U.S. at 51, 119 S.Ct. 977 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).) Though there is some connection between the Credit Union and the State, it does not involve the Credit Union's decision to fire Hauschild for violating its policies or to pursue normal collection efforts on past-due loan amounts and that connection does not rise to a level that permits a finding that Defendants acted under color of state law. Defendants have established that there was no connection between the FBI's decision to question Hauschild and their termination and post-termination actions. Furthermore, Hauschild has failed to establish that the acts of Defendants met either the *Brentwood* "pervasive entwinement" test or the pre-*Brentwood* tests for finding state action: "when the organization performed a public function; was created, coerced, or encouraged by the government; or acted in a symbiotic relationship with the government." *Id.* at 305, 121 S.Ct. 924 (dissent). I turn now to consideration of the facts which Plaintiff asserts are sufficient to establish that Defendants acted under color of state law.

■ The Credit Union is organized under Nebraska law and is regularly audited by the State. However, " '[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State....' " *Sullivan,* 526 U.S. at 52, 119 S.Ct. 977 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

Since its members are largely State employees and their families, the purpose of the Credit Union is to provide credit union services to State employees. (Ex. 4 at Art. II, sec. 1 & Art. IV, sec. 1). This does not establish state action, and particularly does not establish that the "specific conduct of which the plaintiff complains" (Defendants' actions in terminating Plaintiff or their role in the Credit Union's attempts to collect on Plaintiff's delinquent loans) was entwined with the state. Providing credit union services is not a traditional governmental function.

Plaintiff places great weight on the fact that the Credit Union receives some peripheral services from the State. For some time, including the time Plaintiff was an employee of the Credit Union, employees of the Credit Union could participate in the State's group health insurance plan. The Credit Union and its employees paid

for this coverage. However, based upon an opinion of the State attorney general to the effect that such services may not be utilized by persons who are not state employees, that benefit no longer exists for new employees of the Credit Union, although Credit Union employees who had elected this coverage when it was available are grandfathered in. (Ex. 1 at 33:15–35:14; Ex. 2 at ¶ 11; Ex. 13.)[5] The Credit Union's telephone service is obtained through the State of Nebraska's Centrex system, which is also used by State employees. However, the Credit Union receives and pays a bill from the State for telephone services on a monthly basis. (Ex. 1 at 33:15–35:14; Ex. 2 at ¶ 10.) The Credit Union contracts with the State of Nebraska to pick up its mail and deliver it to the United States Post Office located within the State Office Building. The Credit Union is billed for postage and pays a surcharge for this service. (Ex. 2 at ¶ 12.)

Although the Credit Union receives some peripheral services provided through the State, the Credit Union reimburses the State for these services. None of these services provided by the State (mail and telephone service, participation in the State health insurance plan) are related to the alleged constitutional deprivations (Plaintiff's termination and subsequent interaction with the Credit Union). The receipt of these peripheral services does not indicate entwinement, that the alleged constitutional deprivations occurred while Defendants were exercising a public function, that the State encouraged the alleged constitutional deprivations, or that there was a symbiotic relationship between the State and the Credit Union. *See Brentwood,* 531 U.S. at 296, 121 S.Ct. 924. The Credit Union made its own credit and personnel decisions, and had nothing to do with the FBI's decision to contact Hauschild regarding the loans in question.

■ Nor do the factors noted by Plaintiff establish that the alleged constitutional deprivations "result[ ] from the State's exercise of coercive power," such that the state engages in " 'significant encouragement, either overt or covert.' " *Brentwood,* 531 U.S. at 296, 121 S.Ct. 924 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). Here, there is no evidence that the State of Nebraska or any employee or agent of the State had any input or communication with the Credit Union regarding Plaintiff's termination by and subsequent interaction with the Credit Union, much less any coercive influence.

■ Under the joint activity test for determining state action, private actions are considered to have been taken under color of state law where "the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity." *Kirtley v. Rainey,* 326 F.3d 1088, 1093 (9th Cir.2003) (internal citation omitted). In such a situation, the state must "knowingly accept[ ] the benefits derived from the unconstitutional behavior." *Id.* Here, the fact that the Credit Union pays for and receives peripheral services from the State is insuf-

---

**5.** Plaintiff makes the unsupported allegation that employees of the Credit Union receive benefits through the Nebraska State Retirement System. She cites the policy manual for support, but the policy manual contains no provisions dealing with retirement plans. (Filing 40, Pl.'s Br. at 7; Ex. 5.) She also makes the unsupported allegation that the

Credit Union observes the same holidays as those observed by government entities. She cites the policy manual to support this assertion, but the policy manual does no more than list the holidays observed by the Credit Union. (Filing 40, Pl.'s Br. at 7; Ex. 5.) Nothing in evidence establishes the holidays observed by state agencies or employees.

ficient to render the State a joint participant with acts of the Credit Union causing the alleged constitutional deprivation. Nor did the State receive any benefits from Hauschild's termination or the Credit Union's attempts to collect delinquent loans from Hauschild.

Even if Plaintiff could establish that Defendants acted under color of state law, and she cannot, her claims of constitutional deprivation fail as a matter of law for other reasons as well. I turn now to those claims.

### Due Process Claims

■ The initial inquiry in a due process challenge is whether the plaintiff has been deprived of a protected property or liberty interest. *Sullivan*, 526 U.S. at 59, 119 S.Ct. 977. The question of whether the procedures comported with due process is reached only after finding the deprivation of a protected interest. *Id.* The facts indicate that Hauschild has no protected property interest.[6]

■ For due process purposes, an employee does not have a property interest in at-will employment or employment that may be terminated without cause. "That the employee has a contractual right to some form of disciplinary procedure is of no significance if employment itself is terminable at-will." *Bennett v. Watters*, 260 F.3d 925, 929 (8th Cir.2001) (citing *Stow v. Cochran*, 819 F.2d 864, 866–68 (8th Cir.1987)). Hauschild acknowledges that she was an at-will employee. Nebraska law clearly provides that an employee terminable at will generally has no property interest in employment. *Johnston v. Panhandle Coop. Ass'n*, 225 Neb. 732, 408 N.W.2d 261, 269 (1987).

■ In Nebraska, at-will employees may be discharged at any time unless there is a constitutional, statutory, or contractual reason prohibiting discharge. *Malone v. Am. Bus. Info.*, 262 Neb. 733, 634 N.W.2d 788, 790 (2001). Hauschild asserts that the presence of progressive discipline provisions in the policy manual creates a contractual right to progressive discipline which in turn creates a property interest. However, she ignores that although there were procedures for progressive discipline, the Credit Union clearly reserved the right to terminate an employee without prior discipline if the employee was terminated after proof of a violation of Credit Union bylaws, policies or procedures that resulted in a financial loss to the Credit Union. The findings of the Special Committee, adopted by the Board of Directors of the Credit Union, were that Hauschild had acted improperly with regard to the questioned loans to the two individuals in that she "routinely ignored, modified and simply disregarded the policies established by the Board of Directors," resulting in monetary losses to the Credit Union (Ex. 3 at ¶ 12; Ex. 7; Ex. 10.) Under these circumstances, Hauschild had no right to progressive discipline and no property interest.

Hauschild's affidavit states that she "aware of many loans in which other individuals followed the same procedures... and ... were never disciplined" and that she never engaged in any wrongdoing in processing Credit Union loans. (Filing 41, Ex. 1 at ¶ 11.) I disregard these self-serving declarations, which are not based on specified facts or a proper foundation. *Howard*, 363 F.3d at 801. In any event, they do not establish a question of material fact. The legal issue is whether Hauschild had a property interest in her job created by a contractual agreement that she could

---

6. The Amended Complaint (filing 15) asserts that Hauschild had a liberty interest in her reputation, but does not assert any violations of that liberty interest. For that reason, I do not address the existence of a liberty interest.

not be terminated without prior imposition of progressive discipline. Since the policy manual provided that an employee could be terminated without prior discipline if there was proof of a violation of Credit Union bylaws, policies or procedures that resulted in a financial loss to the Credit Union, and since the Special Committee found that Hauschild committed such violations, Hauschild had no property interest in her job.

 Even if Hauschild could show that she possessed a protected property interest in her employment and that Defendants acted under color of state law (and she has established neither), her procedural due process claim still fails as a matter of law because the disciplinary procedures afforded to her complied with the requirements of due process. As the Eighth Circuit has stated, "[t]he fundamental requirement of due process is the opportunity to be heard at 'a meaningful time and in a meaningful manner.'" *Riggins v. Board of Regents*, 790 F.2d 707, 711–12 (8th Cir.1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). The general requirements of procedural due process are these: clear notice of the reasons for termination sufficient to enable the employee to present evidence, notice of the names of persons making the allegations against the employee and the specific nature and factual basis for the allegations, a reasonable time and opportunity to present testimony in the employee's defense, and a hearing before an impartial board or tribunal. *Id.* at 712. The facts establish that Hauschild had the opportunity to be heard at a meaningful time and in a meaningful manner.

 She received a letter setting forth the charges against her. The charges were sufficiently detailed to permit Hauschild's attorney to present a written response to the charges at the beginning of the hearing—the investigatory meeting of the Special Committee. The date of the hearing was delayed to permit the attendance of Hauschild's attorney. The hearing was carried over to a second day to give Hauschild more time to present evidence. She was cross-examined by her counsel and allowed to call at least one witness. Though she was denied the right to call defendant Nielsen as a witness, Nielsen did not work for the Credit Union at the time of the alleged loan policy violations and due process does not require that the employee to be terminated have the opportunity to cross-examine or confront witnesses. *Riggins*, 790 F.2d at 712.

### Equal Protection Claim

 ."In general, the Equal Protection Clause requires that state actors treat similarly situated people alike." *Bogren v. Minnesota*, 236 F.3d 399, 408 (8th Cir. 2000). To establish an equal protection claim, Plaintiff must demonstrate that she was treated differently by a person acting under color of state law than others who were similarly situated because of her membership in a protected class. *Id.*; *Keevan v. Smith*, 100 F.3d 644, 647–48 (8th Cir.1996.) Absent a threshold showing that he or she is similarly situated to persons who received favorable treatment, a plaintiff does not have a viable equal protection claim. *Keevan*, 100 F.3d at 648; *Klinger v. Department of Corr.*, 31 F.3d 727, 731(8th Cir.1994)

First, I note that Plaintiff has failed to establish that Defendants acted under color of state law. This alone defeats her equal protection claim. Even if she had established state action, Plaintiff's equal protection claim would fail because she has failed to identify any other Credit Union employee to whom she was similarly situated and from whom she was treated differently. She has identified no other employee who processed loans in violation of

Credit Union policy but was not terminated. Nor has she established that the collection actions taken on her defaulted loan payments were different than those taken against other Credit Union members with delinquent payments.

Hauschild asserts that at the time she received copies of the notices of default indicating that she was in default on her second mortgage and home equity line of credit, she was not in default but was instead current on her payments. (Filing 41, Ex. 1 at ¶ 6.) However, the facts establish that although she was current on some of her loan payments, she was then delinquent on at least one monthly loan payment and was seriously delinquent on real estate taxes. The default was based in part on failure to pay real estate taxes. A May 12, 2003 letter to Hauschild from James Haszard, the attorney who handled collections for the Credit Union and who had sent Hauschild copies of notices of default, indicates that "the reason the notices were sent is that the real estate taxes are seriously delinquent and this constitutes default of the loans." (Ex. 14, bates no. FS00344.) Hauschild has not identified any other Credit Union borrowers who received a notice of default when they were delinquent on real estate taxes.

■ Though she does not identify any similarly situated persons who were treated more favorably, Hauschild asserts that the fact that she was questioned by the FBI in connection with the loans at issue in her termination establishes differential treatment. As there is no evidence that Defendants initiated contact with the FBI, Hauschild's claim that she was harassed by persons under color of state law fails.

Plaintiff suggests that she was terminated because the loans at issue happened to have been made to African–American loan applicants who were Democrats. Defendants admit that the loans at issue in Plaintiff's termination were made to Afri-

can Americans. (Defs.' Reply Br. at 2.) However, there is no evidence of the political affiliations of those persons. More importantly, there is no evidence tying the disciplinary actions regarding the shortcoming in the loans to the facts that the borrowers in question were African–Americans or members of any particular political party. Nor is there evidence that Hauschild's questioning by law enforcement officials regarding the loans at issue was caused by the race or political affiliation of the borrowers.

*Supplemental Section 20–148 Claim*

Plaintiff asserts that Neb.Rev.Stat. § 20–148 grants her a cause of action for constitutional deprivations if it is determined that the defendants were not acting under color of state law and were private actors. (Pl.'s Br. In Opp'n to Mot. for Summ. J. at 12–13) ("If it is determined by the Court that Defendant Whitaker and Nielsen were not acting under color of state law and were, instead, private actors, then Neb.Rev.Stat. § 20–1348 applies and Ms. Hauschild is entitled to relief under that section ... for the unlawful termination of her employment ... and the violations of [her] procedural due process and equal protection rights with regard to the hearing and the termination.") She is mistaken.

■ Plaintiff has alleged that Defendants violated her rights of procedural due process and equal protection under both the United States and Nebraska Constitutions. Section 20–148 provides that "any person ... who subjects ... any citizen of this state ... to the deprivation of any rights, privileges, or immunities secured by the United States Constitution or the Constitution and laws of the State of Nebraska shall be liable to such person in a civil action." However, § 20–148 "does not purport to create new causes of action or rights but merely provides a civil ave-

nue of recovery for violations of constitutional or statutory civil rights actions." *Ritchie v. Walker Mfg. Co.*, 963 F.2d 1119, 1122 (8th Cir.1992). *See also, Goolsby v. Anderson*, 250 Neb. 306, 549 N.W.2d 153, 157 (1996) (§ 20–148 "is a procedural statute which does not create any new substantive rights"). Thus, for the same reasons that Hauschild's 42 U.S.C. § 1983 claims fail, her § 20–148 claim fails.

## III. CONCLUSION

As more fully explained above, Plaintiff's 42 U.S.C. § 1983 claims fail as a matter of law because Defendants did not act under color of state law. Her procedural due process claim also fails for the reasons that she had no protected property interest in her employment and the procedures afforded to her comported with the requirements for due process. Her equal protection claim also fails for the reason that there is no evidence of unequal treatment. The supplemental claim brought under Neb.Rev.Stat. § 20–148 fails for the same reasons as Plaintiff's § 1983 claims.

Accordingly,

IT IS ORDERED that:

1. Defendants' motion for summary judgment (filing 28) is granted; and

2. Judgment for Defendants providing that Plaintiff shall take nothing on her claims shall be entered by separate order.

## JUDGMENT

Pursuant to the Memorandum and Order entered this date, judgment is entered for the defendant and against the plaintiff providing that the plaintiff shall take nothing.